UNITED STATES of America, and Pattie Black Cotton, Edward M. Francis, Public School Teachers of Halifax County, et al., Appellees,

v.

SCOTLAND NECK CITY BOARD OF EDUCATION, a body corporate, Appellant.

UNITED STATES of America, and Pattie Black Cotton, Edward M. Francis, Public School Teachers of Halifax County, and others, Appellees,

v.

Robert MORGAN, Attorney General of North Carolina, the State Board of Education of North Carolina, and Dr. A. Craig Phillips, North Carolina State Superintendent of Public Instruction, Appellants.

Nos. 14929, 14930.

United States Court of Appeals, Fourth Circuit.

Argued Sept. 16, 1970.

Reargued Dec. 7, 1970.

Decided March 23, 1971.

---

Soveloff, Circuit Judge, dissented and filed opinion, see 442 F.2d 593.

Winter, Circuit Judge, dissented and filed opinion, see 442 F.2d 588.

William T. Joyner, Raleigh, N. C., and C. Kitchin Josey, Scotland Neck, N. C. (Joyner & Howison, Raleigh, N. C., and Robert Morgan, Atty. Gen. of N. C., on brief) for appellants.

Brian K. Landsberg, Atty., Dept. of Justice (Jerris Leonard, Asst. Atty. Gen., David L. Norman, Deputy Asst. Atty. Gen., Francis H. Kennedy, Jr., and Robert Dempsey, Attys., Dept. of Justice, and Warren H. Coolidge, U. S. Atty., on brief) for appellee United States.

James R. Walker, Jr., (Samuel S. Mitchell, Raleigh, N. C., on brief) for appellees Pattie Black Cotton, and others.

Argued Sept. 16, 1970.

Before BOREMAN, BRYAN and CRAVEN, Circuit Judges.

Reargued Dec. 7, 1970.

Before HAYNSWORTH, Chief Judge, and SOBELOFF, BOREMAN, BRYAN, WINTER, CRAVEN and BUTZNER, Circuit Judges sitting en banc, on resubmission.

CRAVEN, Circuit Judge:

The Scotland Neck City Board of Education and the State of North Carolina have appealed from an order of the United States District Court for the Eastern District of North Carolina entered May 23, 1970, declaring Chapter 31 of the 1969 Session Laws of North Carolina unconstitutional and permanently enjoining any further implementation of the statute.[1]  We reverse.

1.  This is one of three cases now before the Court involving the "carving out" of part of a larger school district.  The others are Alvin Turner v. Littleton-Lake Gaston School District, 442 F.2d 584 and Wright v. Council of City of Emporia, 442 F.2d 570.

Chapter 31 of the 1969 Session Laws of North Carolina,[2] enacted by the North Carolina General Assembly on March 3, 1969, provided for a new school district bounded by the city limits of Scotland Neck upon the approval of a majority of the voters of Scotland Neck in a referendum. The new school district was approved by the voters of Scotland Neck on April 8, 1969, by a vote of 813 to 332 out of a total of 1,305 registered voters. Prior to this date, Scotland Neck was part of the Halifax County school district. In July 1969, the United States Justice Department filed the complaint in this action against the Halifax County Board of Education seeking the disestablishment of a dual school system operated by the Board and seeking a declaration of invalidity and an injunction against the implementation of Chapter 31. Scotland Neck City Board of Education was added as a defendant in August 1969, and the Attorney General of North Carolina was add-ed as a defendant in November 1969. On August 25, 1969, the District Court issued a temporary injunction restraining the implementation of Chapter 31, and thereafter on May 23, 1970, made the injunction permanent. The District Court reasoned that Chapter 31 was unconstitutional because it would create a refuge for white students and would interfere with the desegregation of the Halifax County school system.

█ It is clear that Chapter 31 is not unconstitutional on its face. But a facially constitutional statute may in the context of a given fact situation be applied unfairly or for a discriminatory purpose in violation of the equal protection clause of the Fourteenth Amendment. Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). We cannot judge the validity of the statute in vacuo but must examine it in relation to the problem it was meant to solve. Poindexter v. Louisiana Finan-

2. Chapter 31 is entitled and reads as follows:

AN ACT TO IMPROVE AND PROVIDE PUBLIC SCHOOLS OF A HIGHER STANDARD FOR THE RESIDENTS OF SCOTLAND NECK IN HALIFAX COUNTY, TO ESTABLISH THE SCOTLAND NECK CITY ADMINISTRATIVE UNIT, TO PROVIDE FOR THE ADMINISTRATION OF THE PUBLIC SCHOOLS IN SAID ADMINISTRATIVE UNIT, TO LEVY A SPECIAL TAX FOR THE PUBLIC SCHOOLS OF SAID ADMINISTRATIVE UNIT, ALL OF WHICH SHALL BE SUBJECT TO THE APPROVAL OF THE VOTERS IN A REFERENDUM OR SPECIAL ELECTION.

Section 1. There is hereby classified and established a public school administrative unit to be known and designated as the Scotland Neck City Administrative Unit which shall consist of the territory of area lying and being within the boundaries or corporate limits of the Town of Scotland Neck in Halifax County, and the boundaries of said Scotland Neck City Administrative Unit shall be coterminous with the present corporate limits or boundaries of the Town of Scotland Neck. The governing board of said Scotland Neck City Administrative Unit shall be known and designated as the Scotland Neck City Board of Education, and said Scotland Neck City Board of Education (hereinafter referred to as: Board) shall have and exercise all of the powers, duties, privileges and authority granted and applicable to city administrative units and city boards of education as set forth in Chapter 115 of the General Statutes, as amended.

Sec. 2. The Board shall consist of five members appointed by the governing authority of the Town of Scotland Neck, and said five members shall hold office until the next regular municipal election of the Town of Scotland Neck to be held in May, 1971. At the regular election for Mayor and Commissioners of the Town of Scotland Neck to be held in May 1971, there shall be elected five members of the Board, and three persons so elected who receive the highest number of votes shall hold office for four years and the two persons elected who receive the next highest number of votes shall hold office for two years, and thereafter all members of the Board so elected, as successors, shall hold office for four years. All members of the Board shall hold their offices until their sucessors (sic) are elected and qualified. All members of the Board shall be eligible to hold pub-

lic office as required by the Constitution and laws of the State.

Sec. 3. All members of the Board shall be elected by the qualified voters of the Town of Scotland Neck and said election shall be held and conducted by the governing authority of the Town of Scotland Neck and by its election officials and pursuant to the same laws, rules and regulations as are applicable to the election of the municipal officials of the Town of Scotland Neck, and the results shall be certified in the same manner. The election of members of the Board shall be held at the same time and place as applicable to the election of the Mayor and Board of Commissioners of the Town of Scotland Neck and in accordance with the expiration of terms of office of members of the Board. The members of the Board so elected shall be inducted into office on the first Monday following the date of election, and the expense of the election of the members of the Board shall be paid by the Board.

Sec. 4. At the first meeting of the Board appointed as above set forth and of a new Board elected as herein provided, the Board shall organize by electing one of its members as chairman for a period of one year, or until his successor is elected and qualified. The chairman shall preside at the meetings of the Board, and in the event of his absence or sickness, the Board may appoint one of its members as temporary chairman. The Scotland Neck City Superintendent of Schools shall be ex officio secretary to his Board and shall keep the minutes of the Board but shall have no vote. If there exists a vacancy in the office of Superintendent, then the Board may appoint one of its members to serve temporarily as secretary to the Board. All vacancies in the membership of the Board by death, resignation, removal, change of residence or otherwise shall be filled by appointment by the governing authority of the Town of Scotland Neck of a person to serve for the unexpired term and until the next regular election for members of the Board when a successor shall be elected.

Sec. 5. All public school property, both real and personal, and all buildings, facilities, and equipment used for public school purposes, located within the corporate limits of Scotland Neck and within the boundaries set forth in Section 1 of this Act, and all records, books, moneys budgeted for said facilities, accounts, papers, documents and property of any description, shall become the property of Scotland Neck City Administrative Unit or the Board; all real estate belonging to the public schools located within the above-described boundaries is hereby granted, made over to, and automatically by force of this Act conveyed to the Board from the County public school authorities. The Board of Education of Halifax County is authorized and directed to execute any and all deeds, bills of sale, assignments or other documents that may be necessary to completely vest title to all such property in the Board.

Sec. 6. Subject to the approval of the voters residing within the boundaries set forth in Section 1 of this Act, or within the corporate limits of the Town of Scotland Neck, as hereinafter provided, the governing authority of the Town of Scotland Neck, in addition to all other taxes, is authorized and directed to levy annually a supplemental tax not to exceed Fifty Cents (50c) on each One Hundred ($100.00) Dollars of the assessed value of the real and personal property taxable in said Town of Scotland Neck. The amount or rate of said tax shall be determined by the Board and said tax shall be collected by the Tax Collector of the Town of Scotland Neck and paid to the Treasurer of the Board. The Board may use the proceeds of the tax so collected to supplement any object or item in the school budget as fixed by law or to supplement any object or item in the Current Expense Fund or Capital Outlay Fund as fixed by law.

Sec. 7. Within ten days from the date of the ratification of this Act it shall be the duty of the governing authority of the Town of Scotland Neck to call a referendum or special election upon the question of whether or not said Scotland Neck City Administrative Unit and its administrative board shall be established and whether or not the special tax herein provided shall be levied and collected for the purposes herein provided. The notice of the special election shall be published once a week for two successive weeks in some newspaper published in the Town of Scotland Neck or having a general circulation in the Town of Scotland Neck. The notice shall contain a brief statement of the purpose of the special election, the area in which it shall be held, and that a vote by a majority of those voting in favor of this Act will establish the Scotland Neck City Administrative Unit and its Administrative Board as herein set forth, and that an annual tax not to exceed Fifty Cents (50c) on the assessed valuation of real and personal property, according to each One Hundred Dollars ($100.00) valua-

cial Assistance Commission, 275 F.Supp. 833 (E.D.La.1967).

## I.

### The History of School Desegregation in Halifax County and the Attempts to Secure a Separate School District for the City of Scotland Neck

For many years until 1936, the City of Scotland Neck was a wholly separate school district operating independently of the Halifax County school system into which it was then merged. Both the elementary and the high school buildings presently in use in Scotland Neck were constructed prior to 1936 and were financed by city funds.

Halifax County operated a completely segregated dual school system from 1936 to 1965. In 1965, Halifax County adopted a freedom-of-choice plan. Little integration resulted during the next three years. Shortly after the Supreme Court decision in Green v. County School Board of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716, in May of 1968, the Halifax County Board of Education requested the North Carolina Department of Public Instruction to survey their schools and to make recommendations regarding desegregation of the school system.

In July 1968, the Justice Department sent a "notice letter" to the Halifax County Board notifying them that they had not disestablished a dual school system and that further steps would be necessary to comply with Green. After negotiations with the Justice Department, the Halifax County Board agreed informally to disestablish their dual school system by the beginning of the 1969–70 school year, with a number of interim steps to be taken in the 1968–69 school year. As part of the interim steps, the

---

tion, the rate to be fixed by the Board, will be levied as a supplemental tax in the Town of Scotland Neck, for the purpose of supplementing any lawful public school budgetary item. A new registration of voters shall not be required and in all respects the laws and regulations under which the muncipal elections of the Town of Scotland Neck are held shall apply to said special election. The governing authority of the Town of Scotland Neck shall have the authority to enact reasonable rules and regulations for the necessary election books, records and other documents for such special election and to fix the necessary details of said special election.

Sec. 8. In said referendum or special election a ballot in form substantially as follows shall be used: VOTE FOR ONE:

( ) FOR creating and establishing Scotland Neck City Administrative Unit with administrative Board to operate public schools of said Unit and for supplemental tax not to exceed Fifty Cents (50c) on the .assessed valuation of real and personal property according to each One Hundred Dollars ($100.00) valuation for objects of school budget.

( ) AGAINST creating and establishing Scotland Neck City Administrative Unit with administrative Board to operate public schools of said Unit and against supplemental tax not to exceed Fifty Cents (50c) on the assessed valuation of real and personal property according to each One Hundred Dollars ($100.-00) valuation for objects of school budget.

If a majority of the qualified voters voting at such referendum or special election vote in favor of establishing Scotland Neck City Administrative Unit, for creation of administrative Board to operate public schools of said Unit and for special supplemental tax as herein set forth, then this Act shall become effective and operative as to all its provisions upon the date said special election results are canvassed and the result judicially determined, otherwise to be null and void. The expense of said referendum or special election shall be paid by the governing authority of the Town of Scotland Neck but if said Unit and Board are established, then said Town of Scotland Neck shall be reimbursed by the Board for said expense as soon as possible.

Sec. 9. All laws and clauses of laws in conflict with this Act are hereby repealed.

Sec. 10. This Act shall be in full force and effect according to its provisions from and after its ratification.

seventh and eighth grades were transferred from the Brawley School, an all-black school located just outside the city limits of Scotland Neck, to the Scotland Neck School, previously all-white.

The results of the North Carolina Department of Public Instruction survey were published in December of 1968. It recommended an interim plan and a long range plan. The interim plan proposed the creation of a unitary school system through a combination of geographic attendance zones and pairing of previously all-white schools with previously all-black schools. Scotland Neck School was to be paired with Brawley School, grades 1–4 and 8–9 to attend Brawley and grades 5–6 and 10–12 to attend Scotland Neck. The long range plan called for the building of two new consolidated high schools, each to serve half of the geographic area composing the Halifax County school district. The Halifax County Board of Education declined to implement the plan proposed by the Department of Public Instruction and the Justice Department filed suit in July 1969.

Paralleling this history of school segregation in the Halifax County school system is a history of attempts on the part of the residents of Scotland Neck to obtain a separate school district. The proponents of a separate school district began to formulate their plans in 1963, five years prior to the *Green* decision and two years prior to the institution of freedom-of-choice by the Halifax County Board. They were unable to present their plan in the form of a bill prior to the expiration of the 1963 session of the North Carolina Legislature, but a bill was introduced in the 1965 session which would have created a separate school district composed of Scotland Neck and the four surrounding townships, funded partially through local supplemental property taxes. The bill did not pass and it was the opinion of many of the Scotland Neck residents that its defeat was the result of opposition of individuals living outside the city limits of Scotland Neck.

At the instigation of the only Halifax County Board of Education member who was a resident of Scotland Neck, a delegation from the Halifax County schools attempted in 1966 to get approval for the construction of a new high school facility in Scotland Neck to be operated on a completely integrated basis. The proposal was not approved by the State Division of School Planning.

After visiting the smallest school district in the state to determine the economic feasibility of creating a separate unit for the City of Scotland Neck alone, the proponents of a separate school district again sponsored a bill in the Legislature. It was this bill which was eventually passed on March 31, 1969, as Chapter 31 of the Session Laws of 1969.

## II.

### The Three Purposes of Chapter 31

The District Court found that the proponents of a special school district had three purposes in mind in sponsoring Chapter 31 and the record supports these findings. First, they wanted more local control over their schools. Second, they wanted to increase the expenditures for their schools through local supplementary property taxes. Third, they wanted to prevent anticipated white fleeing of the public schools.

Local control and increased taxation were thought necessary to increase the quality of education in their schools. Previous efforts to upgrade Scotland Neck Schools had been frustrated. Always it seemed the needs of the County came before Scotland Neck. The only county-wide bond issue passed in Halifax County since 1936 was passed in 1957. Two local school districts operating in Halifax County received a total of $1,020,000 from the bond issue and the Halifax County system received $1,980,000. None of the money received by Halifax County was spent on schools within the city limits of Scotland Neck. If Scotland Neck had been a separate school district at the time, it would have received $190,000 as its proportionate

share of the bond issue. The Halifax County system also received $950,000 in 1963 as its proportionate share of the latest statewide bond issue. None of this money was spent or committed to any of the schools within the city limits of Scotland Neck. Halifax County has reduced its annual capital outlay tax from 63 cents per $100 valuation in 1957 to 27.5 cents per $100 valuation in the latest fiscal year. In order for the referendum to pass under the terms of Chapter 31, the voters of Scotland Neck had to approve not only the creation of a separate school district but in addition had to authorize a local supplementary property tax not to exceed 50 cents per $100 valuation per year. Despite such a political albatross the referendum was favorable, and moreover, the supplementary tax was levied by the Scotland Neck Board at the full 50 cent rate.

### III.

### White Fleeing—The Questionable Third Purpose

But it is not the permissible first purpose or the clearly commendable second purpose which caused the District Court to question the constitutionality of Chapter 31. It is rather the third purpose, a desire on the part of the proponents of Chapter 31 to prevent, or at least diminish, the flight of white students from the public schools, that concerned the District Court. The population of Halifax County is predominantly black. The population of Scotland Neck is approximately 50 percent black and 50 percent white, and the District Court found that the pupil ratio by race in the schools would have been 57.3 percent white to 42.7 percent black.

A number of decisions have mentioned the problem of white flight following the integration of school systems which have a heavy majority of black students. Monroe v. Board of Commissioners of the City of Jackson, 391 U.S. 450,

459, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968); Brunson v. Board of Trustees of School District No. 1 of Clarendon County, 429 F.2d 820 (4th Cir. 1970); Walker v. County School Board of Brunswick County, 413 F.2d 53 (4th Cir. 1969); Anthony v. Marshall County Board of Education, 409 F.2d 1287 (5th Cir. 1969). All of these cases hold that the threat of white flight will not justify the continuing operation of a dual school system. But it has never been held by any court that a school board (or a state) may not constitutionally consider and adopt measures for the purpose of curbing or diminishing white flight from a unitary school system. Indeed it seems obvious that such a purpose is entirely consistent with and may help implement the *Brown* principle. It is not the purpose of preventing white flight which is the subject of judicial concern but rather the price of achievement. If the effect of Chapter 31 is to continue a dual school system in Halifax County, or establish one in Scotland Neck, the laudable desire to stem an impending flow of white students from the public schools will not save it from constitutional infirmity. But if Chapter 31 does not have that effect, the desire of its proponents to halt white flight will not make an otherwise constitutional statute unconstitutional.

In considering the effect of Chapter 31 on school desegregation in Halifax County and Scotland Neck, it is important to distinguish the effect of Chapter 31 from the effect of a transfer plan adopted by the Scotland Neck Board of Education. The effect of the transfer plan was to substantially increase the percentage of white students in the Scotland Neck schools. But the transfer plan is solely the product of the Scotland Neck Board of Education and not Chapter 31. Therefore the effect of the transfer plan has no relevance to the question of the constitutionality of Chapter 31.[3]

---

3. Appellees argue that the creation of the transfer plan is evidence that the intended effect of Chapter 31 was to preserve the previous racial makeup of the Scotland Neck schools. We disagree.

■ The District Court held that the creation of a separate Scotland Neck school district would unconstitutionally interfere with the implementation of a plan to desegregate the Halifax County schools adopted by the Halifax County Board of Education. We hold that the effect of the separation of the Scotland Neck schools and students on the desegregation of the remainder of the Halifax County system is minimal and insufficient to invalidate Chapter 31. During the 1968–69 school year, there were 10,655 students in the Halifax County Schools, 8,196 (77%) were black, 2,357 (22%) were white, and 102 (1%) were Indian. Of this total, 605 children of school age, 399 white and 296 black, lived within the city limits of Scotland Neck. Removing the Scotland Neck students from the Halifax County system would have left 7,900 (80%) black students, 1,958 (19%) white students, and 102 (1%) Indian students. This is a shift in the ratio of black to white students of only 3 percent, hardly a substantial change. Whether the Scotland Neck students remain within the Halifax County system or attend separate schools of their own, the Halifax County schools will have a substantial majority of black students. Nor would there be a per pupil decrease in the proceeds from the countywide property taxes available in the remaining Halifax County system. The county tax is levied on all property in the county and distributed among the various school districts in the county on a per pupil basis. In addition, the Superintendent of Schools for the Halifax County system testified that there would be no decrease in teacher-pupil ratio in the remaining Halifax County system and in fact that in a few special areas, such as speech therapy, the teacher-pupil ratio may actually increase.

Nor can we agree with the District Court that Chapter 31 creates a refuge for the white students of the Halifax County system. Although there are more white students than black students in Scotland Neck, the white majority is not large, 57.3 percent white and 42.6 percent black. Since all students in the same grade would attend the same school, the system would be integrated throughout. There is no indication that the geographic boundaries were drawn to include white students and exclude black students as there has been in other cases where the courts have ordered integration across school district boundaries. Haney v. County Board of Education of Sevier County, 410 F.2d 920 (8th Cir. 1969). The city limits provide a natural geographic boundary. There is nothing in the record to suggest that the greater percentage of white students in Scotland Neck is a product of residential segregation resulting in part from state action. See Brewer v. School Board of City of Norfolk, 397 F.2d 37 (4th Cir. 1968).

From the history surrounding the enactment of Chapter 31 and from the effect of Chapter 31 on school desegregation in Halifax County, we conclude that the purpose of Chapter 31 was not to invidiously discriminate against black students in Halifax County and that Chapter 31 does not violate the equal protection clause of the Fourteenth Amendment.

Appellees urge in their brief that conceptually the way to analyze this case is

We are concerned here with the intent of the North Carolina Legislature and not the intent of the Scotland Neck Board. In determining legislative intent of an act such as Chapter 31, it is appropriate to consider the reason that the proponents of the act desired its passage if it can be inferred that those reasons were made known to the Legislature. There is evidence in the record to show that the three purposes that the District Court found were intended by the proponents of Chapter 31 were presented to the Legislature. However, there is nothing in the record to suggest that the Legislature had any idea that the Scotland Neck Board would adopt a transfer plan after the enactment of Chapter 31 which would have the effect of increasing the percentage of white students.

We will discuss the transfer plan later in a separate part of the opinion.

to "view the results of severance as if it were part of a desegregation plan for the original system." We do not agree. The severance was not part of a desegregation plan proposed by the school board but was instead an action by the Legislature redefining the boundaries of local governmental units. If the effect of this act was the continuance of a dual school system in Halifax County or the establishment of a dual system in Scotland Neck it would not withstand challenge under the equal protection clause, but we have concluded that it does not have that effect.

But assuming for the sake of argument that the appellees' method of analysis is correct, we conclude that the severance of Scotland Neck students would still withstand constitutional challenge. Although it is not entirely clear from their brief, appellants' apparent contention is that the variance in the ratio of black to white students in Scotland Neck from the ratio in the Halifax County system as a whole is so substantial that if Scotland Neck was proposed as a geographic zone in a desegregation plan, the plan would have to be disapproved. The question of "whether, as a constitutional matter, any particular racial balance must be achieved in the schools" has yet to be decided by the courts. Northcross v. Board of Education of Memphis, 397 U.S. 232, 90 S.Ct. 891, 893, 25 L.Ed.2d 246 (1970) (Burger, C. J., concurring). In its first discussion of remedies for school segregation, Brown v. Board of Education of Topeka, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) (Brown II), the Supreme Court spoke in terms of "practical flexibility" and "reconciling public and private needs." 349 U.S. at 300, 75 S.Ct. 753. In Green v. County School Board of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), the court

made it clear that the school board has the burden of explaining its preference for a method of desegregation which is less effective in disestablishing a dual school system than another more promising method. Even if we assume that a more even racial balance throughout the schools of Halifax County would be more effective in creating a unitary school system, we conclude that the deviation is adequately explained by the inability of people of Scotland Neck to be able to increase the level of funding of the schools attended by their children when the geographic area served by those schools extended beyond the city limits of Scotland Neck.

◼ Our conclusion that Chapter 31 is not unconstitutional leaves for consideration the transfer plan adopted by the Scotland Neck School Board. The transfer plan adopted by the Board provided for the transfer of students from the remaining Halifax County system into the Scotland Neck system and from the Scotland Neck system into the Halifax County system. Transfers into the Scotland Neck system were to pay $100 for the first child in a family, $25 for the next two children in a family, and no fee for the rest of the children in a family. As a result of this transfer plan, 350 white students and 10 black students applied for transfer into the Scotland Neck system, and 44 black students applied for transfer out of the system. The net result of these transfers would have been to have 74 percent white students and 26 percent black students in the Scotland Neck system. We conclude that these transfers would have tended toward establishment of a resegregated system and that the transfer plan violates the equal protection clause of the Fourteenth Amendment.[4] See Monroe v. Board of Commissioners of

4. Pershaps it should be noted that in the school board's amended answer filed on September 3, 1969, it withdrew the original transfer plan and represented to the District Court that it intended to allow only such transfers as "may be in con-

formity to the law and/or Court order or orders applicable to Defendant, and in conformity to a plan of limitation of transfers to be prepared by Defendant and submitted to this Court."

584

the City of Jackson, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968).

We reverse the judgment of the District Court holding Chapter 31 unconstitutional, and remand to the District Court with instructions to dissolve its injunction. The District Court will retain jurisdiction to consider plans of integration proposed by Halifax County Board of Education and by Scotland Neck Board of Education.